**XEROX CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 80–85T.

United States Claims Court.

March 17, 1988.

H. Stewart Dunn, Washington, D.C., for plaintiff, Michael F. Solomon, of counsel.

Kenneth C. Gobetz, Washington, D.C., with whom was Asst. Atty. Gen. William S. Rose, Jr., for defendant.

## OPINION

FUTEY, Judge.

Plaintiff brought this action seeking recovery of federal income taxes totaling $6,333,334 (or such larger sum as is legally due) plus assessed, restricted, and statutory interest for its taxable year ended December 31, 1974. Plaintiff alleged eleven separate grounds of recovery in its complaint, one of which claimed that plaintiff was entitled to a refund of $1,826,222 for an indirect foreign tax credit pursuant to Article 23(1)(c) of the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains (hereinafter the "US–UK Income Tax Treaty" or "Convention"). Defendant answered by denying that plaintiff was entitled to recover on the above or any other causes of action listed in the complaint. While the parties are attempting to resolve the other causes of action without litigation, trial was held on the treaty issue. For the reasons discussed hereinafter, the court concludes that plaintiff is not entitled to an indirect foreign tax credit for the sum here at issue under Article 23(1)(c) of the US–UK Income Tax Treaty. Accordingly, the court holds for defendant and dismisses the above cause of action.

## FACTS

Plaintiff, Xerox Corporation, is a New York corporation engaged in the manufacture and sale of a full range of xerographic and other office equipment products. The company's principal office is in Stamford, Connecticut. As the parent corporation of

an affiliated group of corporations, plaintiff files consolidated federal income tax returns on a calendar year basis and employs the accrual method of accounting.

One of the affiliated corporations of the said affiliated group of corporations is Lyell Holdings, Ltd., a Delaware corporation (hereinafter "Lyell"). Lyell is wholly owned by Xerox and is a resident United Kingdom ("U.K.") corporation. Lyell is treated as a U.K. resident for all U.K. tax purposes.

During 1974 and at all times relevant to this litigation plaintiff owned, directly and through Lyell, a majority of the outstanding voting shares of Rank Xerox, Limited ("RXL"). RXL is a U.K. corporation whose principal office was during 1974, and for many years thereafter, in London, England, U.K. RXL is engaged directly and through multiple U.K. and foreign subsidiary corporations in businesses in the Eastern Hemisphere which are generally comparable to those conducted in the United States by plaintiff and its U.S. subsidiary corporations. RXL has non-U.K. operating subsidiary corporations in most of the major countries of Europe and in many other parts of the Eastern Hemisphere. RXL also owns the share capital of various U.K. corporations, some of which are relevant to this case. The particular U.K. subsidiaries of RXL which are relevant to the instant litigation are:

(a) Rank Xerox Management Ltd. ("RXM"), incorporated in 1965—a holding company owning the share capital of numerous non-U.K. corporations in Europe and other portions of the Eastern Hemisphere;

(b) Rank Xerox (U.K.) Ltd. ("RX–UK"), incorporated in 1937—an operating company engaged in the business of marketing xerographic equipment in the U.K.; and

(c) Rank Xerox Ireland Ltd. ("RX–Ireland"), incorporated in 1937—an operating company engaged in the business of marketing xerographic equipment in Ireland.

The outstanding shares of RXL which are not owned, directly or indirectly, by Xerox are owned by the Rank Organisation Plc. ("RO"), an unrelated publicly held U.K. corporation and its subsidiaries. Also, a limited class of shares of RXL are held by certain key employees of RXL as part of a key executive compensation plan. The share ownership of RXL as of the end of its fiscal year 1974 was as follows:

| Classes of Shares | Par Value in Pounds | Number of Shares Outstanding |
|---|---|---|
| A | 1 | 7,401,254 |
| B | 1 | 7,401,254 |
| C | 1 | 7,481,388 |
| D | 1 | 3,740,694 |
| E | 1 | 49,350 |

Class A, B and E shares are non-voting; Class C and D shares are voting shares. Class A and B shares participate equally in pre-tax profits of RXL up to 7,401,254 pounds and Classes C, D and E shares participate in profits in excess of 7,401,254 pounds. Plaintiff held directly 6,356,147 Class C shares. Lyell held all of the Class A shares and 1,125,241 of the Class C shares. RO held all of the Class B and D shares of RXL either directly or through affiliated companies. Key employees held the Class E shares of RXL. Lyell and RO together own over 75% of the ordinary share capital of RXL for U.K. tax purposes.

\* \* \* \* \* \*

During 1972, the U.K. enacted legislation that significantly altered the U.K. system for taxing corporations and their shareholders. This new legislation, adopting what is generically known as an "imputation system," was enacted as the Finance Act of 1972 (hereinafter "FA 1972").

Under FA 1972, a corporation tax is imposed on U.K. resident corporations on the income and chargeable gains which are derived in a given accounting period. An "accounting period" for purposes of U.K. tax law is the period by reference to which assessments for corporation tax are made. Normally, an accounting period is 12 months. RXL and its subsidiaries had, during 1974 and at all other relevant times, a 12–month accounting period ending October 31.

The corporation tax assessed against the income and chargeable gains of any accounting period is generally due 9 months after the close of such accounting period.

There are certain exceptions to this 9–month period for corporations formed prior to April 1965. RXL, which was formed prior to April 1965, has 18 months from the end of its accounting period in which to pay its corporation tax.

Section 84 of FA 1972 provides that where a corporation resident in the U.K. makes a "qualifying distribution" during its accounting period and such distribution is not made out of "franked investment income," an Advance Corporation Tax (hereinafter "ACT") is imposed on the corporation resident in the U.K. making such qualifying distribution. The term "qualifying distribution" as used in FA 1972 includes all dividends. The term "franked investment income," defined in section 88, FA 1972, refers to a qualifying distribution received by a corporation resident in the U.K. from another corporation resident in the U.K. which carries a related U.K. shareholder credit granted by section 86, FA 1972. "Franked investment income" includes both the qualifying distribution and related tax credit. Such amount is also termed a "franked payment" when reference is made to the amount distributed by the distributing company.

A financial year in the U.K. is the year beginning on April 5 and ending on the succeeding April 4. Thus, the 1974 financial year ran from April 5, 1973 to April 4, 1974. The rate of ACT imposed during that financial year was equal to $\frac{3}{7}$ of the amount of a qualifying distribution.

If ACT is paid (and not repaid) by a U.K. resident corporation making a qualifying distribution, such distributing corporation may use the ACT payment in the following ways:

(a) it may offset the ACT (subject to certain limits) against its own corporation tax liability, i.e., use ACT to satisfy its U.K. corporation tax liability, in respect of the accounting period in which the qualifying distribution is made. Section 85(1), FA 1972;

(b) if the amount of its corporation tax liability in respect of that accounting period is insufficient to absorb the whole of that ACT payment, it may offset the ACT against its corporation tax liabilities in respect of the two preceding accounting periods (on the basis of the latter of the two preceding years first). Section 85(3), FA 1972;

(c) if, after the application of (a) and (b) above, ACT remains unabsorbed as an offset against the U.K. corporation tax liability of the current or two prior accounting periods, the distributing company may carry forward for an indefinite period the unabsorbed ACT and offset it against its corporation tax liabilities for subsequent periods. Section 85(4) FA 1972;

(d) instead of offsetting the ACT payment against its own U.K. corporation tax liability, the distributing company may, under section 92, FA 1972, "surrender" that right to set off ACT against U.K. corporation tax liability (to the extent that an ACT payment arises as a result of the payment of a dividend and not any other kind of qualifying distribution) to one or more of its 51 percent or greater owned subsidiaries. If ACT is surrendered, a subsidiary to which the surrender has been made may set off the ACT surrendered to it (subject to certain limits) against its own U.K. corporation tax liability in respect of the accounting period in which the dividend giving rise to the ACT was paid. To the extent that such corporation tax liability is insufficient to absorb the ACT set off, the company to which the surrender is made (hereinafter "surrenderee") may carry the surrendered ACT set off forward (but not back) for an indefinite period for set off against its U.K. corporation tax liabilities in subsequent periods. A surrenderee cannot make a further surrender of ACT. Section 92(3A), FA 1972.

If a resident U.K. corporation makes a qualifying distribution in one calendar quarter and pays ACT with respect to such distribution, it may obtain a refund of such ACT from Inland Revenue if and to the extent it receives franked investment income during the remainder of the same accounting period. This is the only circumstance by which a distributing company can obtain a refund of ACT paid, and such circumstance is the sole reason for the

parenthetical "(and not repaid)" in section 85(1), FA 1972.

A resident U.K. corporation making a qualifying distribution which is not out of franked investment income must pay ACT regardless of its income whether or not it has any U.K. corporation tax liability which could be satisfied by use of the associated section 85 offset. For this reason and because ACT is not refundable, ACT is not an "estimated tax" payment and is not similar to U.S. corporate estimated tax payments.

When a resident U.K. corporation pays a dividend to another resident U.K. corporation which owns either 51% or more of the ordinary share capital of the distributing company or is a member of a "consortium" [1] owning such company, the distributing company and distributee may jointly elect to treat the dividend as "group income" which operates to exclude the dividend from the requirements of section 84(1), FA 1972 (liability to pay ACT), and from the benefits of section 86, FA 1972 (right to shareholder credit). A group income election does not affect the U.K. corporation tax liability of either the distributing company or the distributee. The distributing company is and remains liable for U.K. corporation tax on its profits out of which any such distribution is made and the distribution does not constitute income to the distributee.

Except with respect to qualifying distributions for which a group income election has been made, U.K. resident shareholders (individual and corporate) receiving qualifying distributions from U.K. resident corporations are entitled to a U.K. shareholder credit under section 86, FA 1972. The U.K. resident shareholder entitled to the U.K. shareholder credit is able to claim such tax credit even in situations where the distributing U.K. resident company making the qualifying distribution has not paid ACT with respect to the distribution and has no franked investment income out of which a qualifying distribution may be made without the payment of additional ACT.

If the recipient of a qualifying distribution is a U.K. resident individual, he is treated, for U.K. income tax purposes, as having received income equal to the aggregate of the amount or value of the qualifying distribution plus the amount of the U.K. shareholder credit. The U.K. shareholder credit is equal to such proportion of the amount or value of the qualifying distribution as corresponds to the rate of ACT in force for the financial year in which the distribution is made. Section 86(2), FA 1972. The U.K. shareholder credit received as a result of the receipt of a qualifying distribution may be applied by that individual against his own income tax liability for the assessment period in which the qualifying distribution is subject to income tax. To the extent that the U.K. shareholder credit exceeds the individual's income tax for such period, he is entitled to a cash payment of the excess by the U.K. Inland Revenue (section 86(4), FA 1972), regardless of whether or not the U.K. resident company paying the dividend to him has itself paid ACT in relation to that dividend and regardless of whether such distributing company had received franked investment income out of which to make such distribution.

A U.K. resident company receiving a qualifying distribution from another such company is also entitled to a U.K. shareholder credit as a result of the receipt of the franked payment. Section 86(1), FA 1972. A U.K. resident company which receives a distribution in respect of which it is entitled to a U.K. shareholder credit, is treated, by section 88, FA 1972, as having received "franked investment income". The receipt of franked investment income correspondingly relieves the U.K. company receiving such income from the liability which would otherwise arise to pay ACT in relation to qualifying distributions made by it to the extent of its franked investment income. Section 89(1), FA 1972.

---

1. A "consortium" is defined under U.K. law (as in effect in 1974) as a group of four or fewer resident U.K. corporations which in the aggregate own 75% or more of the ordinary share capital of another resident U.K. corporation and separately each own at least 5% of the ordinary share capital.

The U.K. resident individual shareholder receiving a qualifying distribution and, with it, the associated U.K. shareholder credit, may only use that shareholder credit in respect of the assessment period in which the distribution is made. Similarly, the U.K. resident corporate recipient is entitled to the benefit of the U.K. shareholder credit in respect of the period in which the qualifying distribution is made. It makes no difference, for this purpose, whether the U.K. company making the distribution has or has not itself paid ACT, or is able to use ACT in any of the aforementioned ways during that accounting period or in any other accounting period.

\* \* \* \* \* \*

Under the Finance Act of 1972, a non-resident of the U.K., individual or corporate, does not receive the benefit of the section 86 U.K. shareholder credit. Thus, the U.K.'s imputation system discriminates against non-resident shareholders in U.K. corporations by taxing profits distributed to them at both the corporate and shareholder levels, while profits distributed to U.K. shareholders are taxed only at the corporate level. Section 497 of the U.K. Income and Corporation Taxes Act of 1970, however, allows bilateral income tax treaties between the U.K. and other countries to confer on such non-residents a right to the U.K. tax credit granted under section 86, FA 1972. To alleviate the discrimination against U.S. shareholders of U.K. corporations, the United States negotiated a new treaty with the United Kingdom (the US–UK Income Tax Treaty) which was signed on December 31, 1975, and came into force on April 25, 1980.

The salient provisions of this treaty are Article 10, entitled "Dividends," and Article 23, entitled "Elimination of Double Taxation." The pertinent sections thereof read as follows:

### Article 10—Dividends

(2)(a) In the case of dividends paid by a corporation which is a resident of the United Kingdom:

(i) to a United States corporation which either alone or together with one or more associated corporations controls, directly or indirectly, at least 10 percent of the voting stock of the corporation which is a resident of the United Kingdom paying the dividend, the United States corporation shall be entitled to a payment from the United Kingdom of a tax credit equal to one-half of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 5 percent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such corporation;

(ii) in all other cases, the resident of the United States to whom such dividend is paid shall be entitled to a payment from the United Kingdom of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 15 percent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such resident;

(iii) the aggregate of the amount or value of the dividend and the amount of the tax credit referred to in sub-paragraphs (a)(i) and (ii) of this paragraph paid by the United Kingdom to the United States corporation or other resident (without reduction for the 5 or 15 percent deduction, as the case may be, by the United Kingdom) shall be treated as a dividend for United States tax credit purposes.

### Article 23—Elimination of Double Taxation

(1) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof) the United States shall allow to a resident or nation-

al of the United States as a credit against the United States tax the appropriate amount of tax paid to the United Kingdom; and, in the case of a United States corporation owning at least 10 percent of the voting stock of a corporation which is a resident of the United Kingdom from which it receives dividends in any taxable year, the United States shall allow credit for the appropriate amount of tax paid to the United Kingdom by that corporation with respect to the profits out of which such dividends are paid. Such appropriate amount shall be based upon the amount of tax paid to the United Kingdom, but the credit shall not exceed the limitations (for the purpose of limiting the credit to the United States tax on income from sources outside of the United States) provided by United States law for the taxable year. For the purposes of applying the United States credit in relation to tax paid to the United Kingdom:

(a) the taxes referred to in paragraphs (2)(b) and (3) of Article 2 (Taxes Covered) [2] shall be considered to be income taxes;

(b) the amount of 5 or 15 percent, as the case may be, withheld under paragraph (2)(a)(i) or (ii) of Article 10 (Dividends) from the tax credit paid by the United Kingdom shall be treated as an income tax imposed on the recipient of the dividend; and

(c) that amount of tax credit referred to in paragraph (2)(a)(i) of Article 10 (Dividends) which is not paid to the United States corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend shall be treated as an income tax imposed on the corporation paying the dividend.

2. These paragraphs read as follows:
   (2) the existing taxes to which this Convention shall apply are:
   (b) in the case of the United Kingdom, the income tax, the capital gains tax, the corporation tax and the petroleum revenue tax. The foregoing taxes covered are hereinafter referred to as "United Kingdom Tax";

The Article 23(1) U.S. tax credit for taxes paid to the U.K. was given retroactive application to April 1, 1973. However, the Article 10(2)(a)(i) U.K. payment with respect to dividends distributed by a U.K. corporation to a (10% or greater) U.S. corporate shareholder was given retroactive application only to April 6, 1975. Thus, during the 1974 tax year at issue in this action, the U.S. foreign tax credit plaintiff claims under Article 23(1)(c) was not defrayed by any U.K. payment under Article 10(2)(a)(i).

\*  \*  \*  \*  \*  \*

During 1974, RXL paid the following amounts of dividends to its shareholders and ACT to the United Kingdom tax authorities with respect to such dividends (in pounds sterling):

| Shareholder | Amount of Dividend |
|---|---|
| Plaintiff (including Lyell) | 9,166,714 |
| RO and Affiliates and Class E Shareholders | 4,833,286 |
| Total Dividends | 14,000,000 |
| ACT | 6,000,000 |

The applicable exchange rate for conversion of pounds sterling to dollars for U.S. foreign tax credit purposes in 1974 is 2.3335 dollars to one pound. Accordingly, the dollar equivalents of the foregoing amounts are as follows:

| Shareholder | Amount of Dividend |
|---|---|
| Plaintiff (including Lyell) | $21,390,527 |
| RO and Affiliates and Class E Shareholders | $11,278,473 |
| Total Dividends | $32,669,000 |
| ACT | $14,000,000 |

Under U.K. law, a foreign tax credit against U.K. corporation tax is granted by reason of the receipt of dividends from non-U.K. resident corporations out of the income of such non-U.K. resident corpora-

(3) This Convention shall also apply to any identical or substantially similar taxes which are imposed by a Contracting State or its political subdivisions or local authorities after the date of signature of this Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any changes which have been made in their respective taxation laws.

tions which has been subject to an income tax in a foreign jurisdiction.

The section 85 set off against U.K. corporation tax, if not surrendered, satisfies U.K. corporation tax liability prior to the use of any foreign tax credits to satisfy such U.K. corporation tax liability. Foreign tax credits arising under U.K. law by reason of the receipt of dividends from non-U.K. resident corporations which are not used against the U.K. corporation tax liability of the U.K. resident corporation receiving such dividends for the accounting period in which the dividends are received are lost and may not be carried back or carried forward.

In order to avoid losing sizeable foreign tax credits under U.K. law, RXL surrendered a portion of the ACT offset arising from its 1974 dividend, and satisfied a substantial portion of its 1974 corporation tax liability by using foreign tax credits it would otherwise have lost had such ACT set off not been surrendered.

Of the 6,000,000 pounds ($14,000,000) of ACT paid by RXL in 1974, 4,407,855 pounds ($10,285,730) was subsequently surrendered to its subsidiaries RX–UK, RXM, and RX–Ireland to be used in reducing their U.K. corporation tax liabilities. Only 1,592,145 pounds ($3,715,270) of the ACT paid in 1974 was applied in reduction of RXL's U.K. corporation tax liability for the tax year 1974.

The parties agree that the latter sum qualifies for credit in 1974 under Article 23(1) of the US–UK Income Tax Treaty, which took effect on April 25, 1980. However, defendant disputes plaintiff's claim that such credit should also apply to any of the 4,407,855 pounds ($10,285,730) of surrendered ACT.

On February 28, 1984, plaintiff filed a timely claim with the Internal Revenue Service (based on the above and other causes of action) for refund of federal income tax in the amount of $5,272,575, or such greater amount as is legally refundable, for the tax year 1974. Plaintiff amended this claim on February 26, 1985, in the additional amount of $1,052,650 or such greater amount as is legally refundable.

No action having been taken by IRS on the February 28, 1984 refund claim, and more than six months having passed since filing as required by section 6532 of the Internal Revenue Code, plaintiff filed its complaint in this court on February 7, 1985, in the principal sum of $6,333,334. The complaint listed eleven causes of action, the second of which claimed entitlement to additional foreign tax credit in the amount of $3,511,965, which after adjustment (for the additional deemed dividend of the amount under section 78 of the Internal Revenue Code) would result in a refund to the plaintiff of $1,826,222 with respect to the indirect foreign tax credit provided under Article 23(1)(c) of the US–UK Income Tax Treaty.

Trial was held on the treaty issue in Washington, D.C. on October 13–14, 1987.

## DISCUSSION

The issue at bar is whether the surrender by RXL of a portion of its section 85 offset to U.K. subsidiaries should have any effect on the availability of an Article 23(1)(c) U.S. foreign tax credit to its parent, Xerox. Plaintiff contends that RXL's surrender of the balance of its section 85 offset does not affect Xerox's entitlement to the full Article 23(1)(c) U.S. foreign tax credit in the 1974 year of distribution. Defendant's position, however, is that the indirect foreign tax credit granted to Xerox (and Lyell) under the provisions of Article 23 should be calculated as if RXM, RX–Ireland, and RX–UK, rather than RXL, had actually paid the ACT which was used to satisfy portions of their corporation tax liabilities. In other words, Xerox should receive no Article 23(1)(c) credit for any ACT offset surrendered by RXL.

Plaintiff builds its case for a full indirect foreign tax credit under Article 23(1)(c) on three lines of reasoning:

(1) The U.S. foreign tax credit provided by the terms of Article 23(1)(c) is based on the shareholder credit under section 86, FA 1972, and not on the payment of ACT under section 84, so that the use of the section 85 offset by the payor of the dividend

or its surrenderee is irrelevant to the issue of when the Article 23(1)(c) credit is properly taken into account.

(2) Even if Article 23(1)(c) were considered to provide a U.S. foreign tax credit for section 84 ACT, ACT is a tax which is paid or accrued in the year the related dividend is paid and therefore, under U.S. law, gives rise to a U.S. foreign tax credit in the year of distribution.

(3) In no event can a surrender under section 92, FA 1972, make the surrenderee the "taxpayer" of ACT under U.S. or U.K. law, or the "corporation paying the dividend" under the language of Article 23(1)(c) of the Treaty.

Plaintiff contends that these arguments are supported by both the language and purpose of Articles 10 and 23 of the Treaty.

Defendant, however, contends that these Articles inextricably link the U.S. foreign tax credit to the payment of ACT and the year of its application against U.K. corporation tax liability. According to this view, the Article 23(1)(c) U.S. foreign tax credit arising as a result of the U.K. subsidiary's dividend distribution and payment of ACT applies only until the ACT is used to offset U.K. corporation tax liability. Thus, in the event the section 85 ACT offset is surrendered, in whole or in part, to another U.K. corporation and applied against its U.K. corporation tax liability, the U.S. direct investor's Article 23(1)(c) credit becomes an Article 23(1)(a) credit, no longer applicable in the year of dividend distribution but rather in the year the offset is applied against the surrenderee's U.K. corporation tax liability. Defendant points to the language and purpose of Articles 10 and 23, as well as the explicit interpretations thereof by both treaty parties, as supporting the foregoing argument.

### Analysis of Articles 10 and 23

Plaintiff, in support of its theory that the Article 23(1)(c) U.S. foreign tax credit is based on the section 86 shareholder credit and independent of the section 84 payment of ACT or the section 85 offset, cites the following language from Articles 10(2)(a)(i) and 23(1)(c) of the Treaty.

### Article 10(2)(a)(i)

"... the United States corporation shall be entitled to a payment from the United Kingdom of a tax credit equal to one-half of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend ..."

### Article 23(1)(c)

".... For the purposes of applying the United States credit in relation to tax paid to the United Kingdom:

... that amount of tax credit referred to in paragraph (2)(a)(i) of Article 10 (Dividends) which is not paid to the United States corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend shall be treated as an income tax imposed on the corporation paying the dividend."

The "tax credit" referred to above is, as plaintiff asserts, the section 86 U.K. shareholder credit. However, a credit against U.K. tax liability is not what the foregoing articles confer upon a U.S. shareholder. Article 10(2)(a)(i) provides that a U.S. direct investor receive a "payment" from the U.K. "equal to one-half of the tax credit" a U.K. resident would receive. Moreover, Article 23(1) specifically provides that a U.S. direct investor be allowed a U.S. tax credit "for the appropriate amount of tax paid (emphasis added) to the United Kingdom" on account of the dividend distribution. The Article 23(1)(c) credit is qualified as a U.S. credit applied "in relation to tax paid to the United Kingdom."

Thus, the treaty language cited by plaintiff hardly affirms its theory that the applicability of an Article 23(1)(c) U.S. foreign tax credit is entirely independent of the ACT paid by its U.K. subsidiar(ies). To better determine the intent of the treaty parties with respect to the applicability of the Article 23(1)(c) credit, it is appropriate to examine the official pronouncements of the United States (and the United Kingdom) in connection with the ratification and implementation of the Convention. *Air*

*France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." (quoting *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943)).

### The Technical Explanation

After the signing of the US–UK Income Tax Treaty on December 31, 1975, a "Technical Explanation" was prepared by the U.S. Department of the Treasury in connection with the submission of the Convention to the Senate for hearings on ratification in 1977. The Technical Explanation, which provided an article by article interpretation of the Convention, stated the following with respect to ACT in the context of Article 23:

> "ACT which reduces mainstream [corporation] tax in any year or years shall be attributable to any accumulated profits of the year or years for which the mainstream tax is reduced. Where ACT is used to offset mainstream tax, the offset will be viewed as a refund of the ACT initially allowed as a credit and as a tax paid in respect of the year for which the ACT is applied as an offset. Consequently, a reduction in the foreign tax credit for the year from which the ACT is carried must be made in accordance with section 905(c) of the Code."

This explanation accords with defendant's view that the Article 23(1)(c) U.S. foreign tax credit is linked to the payment of ACT and the year of its application as an offset against U.K. corporation tax liability. It refutes plaintiff's first two arguments that ACT and offset considerations are unconnected to the Article 23(1)(c) credit.

The Technical Explanation reveals the intent of Treasury with respect to the Convention and, as numerous federal courts

have stated, "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982); *See also Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *Great–West Life Assurance Co. v. United States,* 230 Ct.Cl. 477, 491, 678 F.2d 180, 189 (1982). Moreover, the Senate's consideration of the Convention, beginning in July 1977, was based upon the interpretation set forth in the Technical Explanation. Hearings and floor debates were held, following which the Senate initially rejected the treaty before approving it with two reservations in June 1978. The Convention was ratified by the Senate in its final form on July 9, 1979. The record does not indicate any disagreement in the Senate during this time concerning the interpretation of Article 23 in the Technical Explanation, or any proposals for reservations in regard thereto. At most, the Senate Committee on Foreign Relations, in recommending ratification of the Convention, acknowledged Treasury's discretionary authority in the future administration of the Article 23 provisions.[3] Accordingly, it is logical to conclude that the Senate was in accord with Treasury's interpretation of Article 23 as set forth in the Technical Explanation when it ratified the US–UK Income Tax Treaty in 1978–79.

Similarly, the record indicates at least tacit acceptance by the U.K. of the U.S. interpretation of Article 23(1)(c) as set forth in the Technical Explanation. As stated in the affidavit of Steven P. Hannes, who was a member of the U.S. negotiating team in 1975 and an attorney for Treasury during the U.S. Senate's consideration of the treaty, "copies of the Technical Explanation would have been sent to the U.K.

---

**3.** "[I]n recommending the ratification of the treaty, the Committee does not intend to adopt or reject the amplifications of the foreign tax credit rules contained in the Treasury technical explanation. Consequently, Treasury would not

be foreclosed by the ratification of the Treaty from modifying those administrative interpretations in the future should it deem it advisable to do so. S.Exec.Rep. 18 at 36–37, reprinted in 1980–81 Cum.Bull. at 429.

negotiators." [4] Knowledge of the U.S. interpretation, therefore, was clearly before the House of Commons during its own ratification debate. The U.K. ratified the Convention in the form approved by the U.S. Senate, without further reservation or amendment, by enacting section 16 of the Finance Act (No. 2) 1979, dated July 26, 1979.

### Revenue Procedure 80–18

On April 25, 1980, the day the US–UK Income Tax Treaty took effect, the Internal Revenue Service issued Revenue Procedure (Rev.Proc.) 80–18 setting forth procedures for U.S. taxpayers to follow under the applicable provisions of Articles 10 and 23. Section 3.05 of Rev.Proc. 80–18 described the tax ramifications of Article 23(1)(c), in pertinent part, as follows:

> Paragraph (1)(c) of Article 23 provides, in addition, that the one-half of the ACT paid by a United Kingdom corporation that is not refunded to a U.S. direct investor [pursuant to Article 10] and that would be credited or refunded to a United Kingdom individual resident is treated as an income tax imposed on the distributing United Kingdom corporation (rather than the U.S. shareholder). Under United Kingdom law, a United Kingdom corporation that pays ACT may, however, transfer to a related United Kingdom corporation the right to apply ACT against mainstream tax liability. Thus, for example, a United Kingdom subsidiary of a United Kingdom corporation may benefit from the parent's ACT payment by offsetting part or all of the ACT against its own liability for United Kingdom mainstream tax. *In such a case, for U.S. foreign tax credit purposes and pursuant to Article 23, the parent corporation has not paid or accrued the unrefunded ACT offset against the subsidiary's mainstream tax and has contributed to the capital of the subsidiary an amount equal to the unrefunded ACT offset. The subsidiary is considered to have paid or accrued only mainstream tax paid or accrued in excess of the ACT offset, plus the amount*

*of unrefunded ACT so offset.* (Emphasis added.)

This revenue ruling, augmenting the treaty interpretation outlined in the Technical Explanation, fully accords with defendant's position on Article 23(1)(c). All three of plaintiff's arguments conflict with Rev. Proc. 80–18.

### Competent Authority Agreement

Notwithstanding the foregoing authority, Xerox and other U.S. "direct investors" in U.K. corporations continued to express doubts about the U.S. government's interpretation of Article 23(1). To resolve this ongoing dispute, the "competent authorities" of the United States and the United Kingdom entered into negotiations in accordance with the Convention's Article 25 "Mutual Agreement Procedure." This article provides, in pertinent part, as follows:

> ARTICLE 25—MUTUAL AGREEMENT PROCEDURE
>
> . . . .
>
> (3) The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular the competent authorities of the Contracting States may reach agreement on:
>
> (a) the attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;
>
> (b) the allocation of income, deductions, credits, or allowances between persons;
>
> (c) the nature of particular items of income;
>
> (d) the meaning of terms not otherwise defined in this Convention;
>
> (e) the place where a particular item of income has it source.
>
> (4) The competent authorities of the Contracting States may communicate with each other directly for the purpose of

---

**4.** Plaintiff's Exhibit 30, Affidavit of Steven P. Hannes, pp. 7–8.

reaching agreement as contemplated by this Convention.[5]

After several years of correspondence and meetings between the U.S. and U.K. competent authorities, an agreement emerged in December 1986. This agreement took the form of an exchange of letters which read as follows:

December 18, 1986

Mr. P.W. Fawcett
Inland Revenue, Policy Division
Room F–14, West Wing
Somerset House
London, WC2R 1LB
England

Dear Mr. Fawcett:

*The following* memorializes the agreements reached at our meetings of July 11, and September 12, 1986, and *is intended to constitute, when accepted by you, a competent authority agreement under Article 25 of the Convention* between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and Prevention of Fiscal Evasion with respect to Taxes on Income (the "Convention"). (Emphasis added.)

1. *It is agreed that Article 23(1)(c) provides a mechanism by which a U.S. foreign tax credit may be obtained for that part of the U.K. tax credit referred to in Article 10(2)(a)(i) which is not paid to a U.S. corporation* but to which an individual resident in the United Kingdom would have been entitled had he received the dividend. (Emphasis added.)

2. *It is agreed that Article 23(1)(c) was included in the Convention for the purpose of ensuring that in accordance with Article 23(1)(a) the Advance Corporation Tax ("ACT") payment* which generally underlies the U.K. tax credit referred to in paragraph 1 *would be treated as an income tax paid to the United Kingdom by the U.K. corporation paying the dividend,* because the United States questioned to what extent, in the absence of the Convention, payments of ACT would be treated as payments of a creditable corporate income tax for U.S. foreign tax credit purposes. (Emphasis added.)

3. *It is agreed that, pursuant to Article 23(1), the Article 23(1)(c) mechanism must be applied in accordance with* the provisions and subject to the limitations of *the law of the United States and that a credit is to be given under Article 23(1)(c) only for the appropriate amount of tax paid to the United Kingdom.* (Emphasis added).

4. *It is agreed that Article 23(1) of the Convention was not intended to provide two U.S. foreign tax credits for a single payment of ACT to the United Kingdom* or U.S. foreign tax credits in excess of the amount of corporation tax (including both ACT and mainstream corporation tax) paid to the United Kingdom in respect of the profits out which a dividend is paid. (Emphasis added.)

5. *It is agreed that under the language of Article 23(1)* which provides that the Article 23(1)(c) credit must be allowed in accordance with the provisions and subject to the limitations of the law of the United States, *the timing of the credit is to be determined as a matter of U.S. law.* (Emphasis added.)

I would appreciate your reply as to whether you are in agreement with the propositions set forth in paragraphs (1) through (5) above. If you do assent to these propositions, we will consider such propositions to be a competent authority agreement under Article 25 of the Convention. *This agreement will supercede any and all prior agreements or correspondence between us regarding the matters addressed herein.* (Emphasis added.)

Sincerely,

/s/ P.E. Coates

[U.S. Competent Authority]

---

**5.** The United States Competent Authority, as delegated by the Secretary of the Treasury, is the Associate Commissioner (Operations) of the Internal Revenue Service.

Mr. P.E. Coates
Associate Commissioner (Operations)
Internal Revenue Service
Department of the Treasury
Washington, DC 20224
USA

                        23 December 1986

Dear Mr. Coates:

Thank you for your letter of 18 December 1986 recording the agreements reached at our meetings on 11 July and 12 September 1986.

I am writing to say that *I am in agreement with the propositions set out in paragraphs 1 to 5 of your letter, and your letter and this letter now constitute a competent authority agreement* under Article 25 of the UK/US Double Taxation Convention, *superseding previous correspondence between us* on the matters covered in the letters. (Emphasis added.)

Yours sincerely,

/s/ P.W. Fawcett

[U.K. Competent Authority]

This "Competent Authority Agreement" further supports defendant's position that the Article 23(1)(c) U.S. foreign tax credit is linked to the payment of ACT rather than the preceding dividend distribution by the U.K. corporation. It affirms that both treaty parties view the application of the Article 23(1)(c) credit as a matter of U.S. law, thereby undermining plaintiff's argument that this credit is based on the shareholder credit of U.K. law (section 86, FA 1972), which arises as the direct consequence of a dividend distribution by a U.K. corporation without regard to whether ACT is paid thereon. Moreover, the agreement of the competent authorities as to the governance of U.S. law over the timing of the Article 23(1)(c) credit accords with defendant's view, previously expressed in the Technical Explanation and Rev.Proc. 80–18, that the credit must ultimately be applied in the year the underlying ACT is used to offset U.K. corporation tax liability.

\* \* \* \* \* \*

Plaintiff challenges the authoritativeness of the foregoing official pronouncements with respect to the proper interpretation of Article 23(1)(c). The Technical Explanation is characterized by plaintiff as a vehicle by which Treasury attempted not just to explain the treaty's contents, but "to legislate its changing views of what it believes should have been added to the treaty." [6] Plaintiff charges that Rev.Proc. 80–18, in its explanation of the U.S. foreign tax credit consequences of an ACT surrender, misconstrues both U.S. law and the terms of the treaty and is therefore "invalid." [7] As for the Competent Authority Agreement, plaintiff asserts that it is weak on content —a collection of "self-evident and non-controversial statements which are more consistent with plaintiff's position than defendant's." [8] More importantly, according to plaintiff, neither the Competent Authority Agreement nor the Technical Explanation addresses the central issue in this case— the significance for Xerox of RXL's surrender of section 85 ACT offsets. Accordingly, plaintiff maintains that none of these materials provides a reliable guide as to the intent of the treaty parties. Thus, they should not be accorded much evidentiary weight in this action.

The court, however, does not share plaintiff's dim view of these documents. As previously discussed, Treasury's Technical Explanation was presented to the U.S. Senate as an aid to its understanding of the treaty articles, and the Senate's intent in ratifying the Convention was clearly shaped thereby. In view of the United Kingdom's subsequent ratification of the Convention without reservation, and with full knowledge of the Technical Explanation underlying the U.S. ratification, it is difficult to sustain plaintiff's assertion that the Technical Explanation did not conform with the terms of the treaty. Moreover, plaintiff can hardly minimize the importance of the Competent Authority Agreement as an expression of the intent of the treaty parties, since Article 25(3) of the Convention specifically empowered the competent authorities "to resolve ... any

6. Pretrial Reply Brief of Plaintiff, p. 30.

7. Pretrial Brief of Plaintiff, pp. 43–47.

8. Pretrial Reply Brief of Plaintiff, p. 25.

difficulties or doubts arising as to the interpretation or application of the Convention." Courts have traditionally been reluctant to impinge on the judgments of competent authorities charged by the treaty states with responsibilities of interpretation and implementation. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982); *Filler v. Commissioner,* 74 T.C. 406, 408–09 (1980); *See also Collins v. Weinberger,* 707 F.2d 1518, 1522–1523 (D.C.Cir.1983). As the Supreme Court stated in *Sumitomo,* 457 U.S. at 185, 102 S.Ct. at 2379, "Our role is limited to giving effect to the intent of the Treaty parties. When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation."

This court finds no such "extraordinarily strong contrary evidence" in the case at bar, to the effect that the Competent Authority Agreement misinterprets the language of the Convention or the intent of the treaty parties. Nor does the court find this Agreement a relatively substance-less document generally favorable, as plaintiff alleges, to its position. To the contrary, as previously discussed, the court finds the Competent Authority Agreement strongly supportive of defendant's position on Article 23(1)(c). Moreover, the court finds this Agreement, along with the Technical Explanation and Rev.Proc. 80–18, fully in accordance with the language of Article 23(1) tying the U.S. tax credit under Article 23(1)(c) not just to a dividend distribution, but "to tax paid to the United Kingdom."

Plaintiff's assertion that the Competent Authority Agreement and the Technical Explanation fail to address the ACT surrender issue is specious. While the word "surrender" may not appear in the texts, that action is clearly covered in previously cited passages from these documents. Thus, the Technical Explanation states with respect to Article 23:

"Where ACT is used to offset mainstream tax, the offset will be viewed as a refund of the ACT initially allowed as a credit and as a tax paid in respect of the year for which the ACT is applied as an offset."

And the Competent Authority Agreement states in paragraph 5:

"It is agreed that under the language of Article 23(1) ... the timing of the credit is to be determined as a matter of U.S. law."

These passages present the scenario of the U.S. tax credit arising in a different year from that of the ACT payment, which would happen when either the original payor of ACT *or* its subsidiar(ies), as *surrenderee(s),* apply the ACT offset against U.K. mainstream tax liability in a year other than that of the dividend distribution.

Plaintiff contends that Rev.Proc. 80–18 is out of step with U.S. tax law and the language of Article 23(1)(c). In particular, plaintiff argues that RXL was the "technical taxpayer" of the ACT for U.S. foreign tax credit purposes under the principles set forth by the Supreme Court in *Biddle v. Commissioner,* 302 U.S. 573, 579–81, 58 S.Ct. 379, 382, 82 L.Ed. 431 (1938). Rev. Proc. 80–18, plaintiff asserts, is in direct conflict with the *Biddle* decision. Plaintiff also cites Treasury Reg. § 1.901–2(f), issued in 1983, which defines "taxpayer" for foreign tax credit purposes as "the person on whom foreign law imposes legal liability for such tax." According to plaintiff, language in Rev.Proc. 80–18 to the effect that, after a U.K. corporation's payment of ACT and surrender of the offset to a subsidiary who applies it against U.K. corporation tax, "for U.S. foreign tax credit purposes and pursuant to Article 23, the parent corporation has not paid or accrued the unrefunded ACT offset against the subsidiary's mainstream tax" cannot be reconciled with U.S. tax law.

The above language, however, addresses the potential problem of double crediting for a single payment of ACT. As defendant points out, Article 23(1)(c) treats the corporation paying ACT as having paid an income tax for U.S. tax purposes, while Article 23(1)(a) also treats the surrenderee of the offset who applies it against its own

corporation tax liability as having paid the ACT for U.S. tax purposes. To forestall any double credit, Rev.Proc. 80–18 treats the original Article 23(1)(c) credit as reversed in favor of an Article 23(1)(a) credit whereby "the subsidiary is considered to have paid or accrued only mainstream tax paid or accrued in excess of the ACT offset, plus the amount of unrefunded ACT so offset." This ruling accords with the body of U.S. law holding that double crediting is to be avoided unless expressly anticipated or provided for by Congress. *Cleveland Electric Illuminating Co. v. United States,* 6 Cl.Ct. 711, 715 (1984); *National Cash Register Co. v. United States,* 400 F.2d 820, 825–26 (6th Cir.1968). Moreover, Rev.Proc. 80–18 was expressly affirmed in the subsequent Competent Authority Agreement which stated that "Article 23(1) of the Convention was not intended to provide two U.S. foreign tax credits for a single payment of ACT to the United Kingdom." 1986 Competent Authority Agreement, ¶ 4, *supra.*

Authority for this reversal of the Article 23(1)(c) credit when ACT is surrendered can also be found in section 905(c) of the Internal Revenue Code, which requires a recomputation of the U.S. indirect foreign tax credit when foreign taxes are refunded. As previously noted, the Technical Explanation which formed the basis of the Senate's understanding of the Convention and which was tacitly accepted by the U.K. prior to its own ratification, stated specifically that "Where ACT is used to offset mainstream tax, the offset will be viewed as a *refund* of the ACT initially allowed as a credit," necessitating "a *reduction* in the foreign tax credit for the year [the ACT was initially paid] ... in accordance with section 905(c) of the Code." (Emphasis added.) This language, in confirming the applicability of section 905(c) in determining entitlement to a U.S. foreign tax credit under the Convention, manifests the interim nature of the Article 23(1)(c) credit.

With the reversal of the initial credit arising with the payment of ACT, Article 23(1)(a) remains the only avenue to claim a credit for the ACT. The credit shifts to the year(s) the ACT is applied against "main-stream" (corporation) tax and is viewed "as a tax paid in respect of [that] year." 1977 Technical Explanation, *supra.* Based on this language in the Technical Explanation, Rev. Proc. 80–18 duly recognizes that the "tax paid" by a subsidiary (as surrenderee) applying the ACT offset is "the amount of the unrefunded ACT." While plaintiff objects to this interpretation not only shifting the credit mechanism from Article 23(1)(c) to Article 23(1)(a) but also making the surrenderee the deemed payor of the ACT, the court does not find the interpretation unreasonable in view of the fact that the *surrenderee's* U.K. tax liability is satisfied.

In this respect the court finds the case at bar distinguishable from *Biddle, supra.* In that case plaintiff, a U.S. national who received cash dividends on stock held in three U.K. corporations, claimed U.S. foreign tax credits based on the U.K. income taxes assessed against the U.K. corporations with respect to the profits out of which the dividends were distributed. The Supreme Court, noting that Biddle had no independent U.K. tax liability and received his dividends only after the U.K. corporations had been taxed upon their earnings, held that Biddle could not be considered the taxpayer of any U.K. income taxes for U.S. foreign tax credit purposes. In the case at bar, RXM, RX–UK, and RX–Ireland did have their own U.K. corporation tax liabilities which were satisfied, at least in part, by the application of the ACT offsets received from RXL. The surrenderees were certainly "the person[s] on whom foreign law imposes legal liability for such [corporation] tax[es]" within the meaning of Treasury Reg. § 1.901–2(f), *supra,* unlike Biddle who had no such liability with regard to U.K. income taxes on the earnings from which his dividends were distributed. Moreover, treating the surrenderees as the deemed payors of ACT when they apply the offsets against U.K. corporation tax liability furthers the expressed purpose of both treaty parties to prevent a double U.S. tax credit for a single payment of ACT.

Accordingly, the court rejects plaintiff's contention that Rev.Proc. 80–18 is "invalid" insofar as it treats the surrenderee as the

deemed taxpayer of ACT for U.S. foreign tax credit purposes. Nor does the court find any relevance in plaintiff's companion argument that a surrenderee cannot be considered the "corporation paying the dividend" under Article 23(1)(c) of the treaty, since a surrenderee applies the ACT offset against U.K. tax liability under Article 23(1)(a) and not as the "corporation paying the dividend" under Article 23(1)(c). Thus, the court finds the theories advanced by plaintiff in its third line of reasoning (p. 462, *supra*) unpersuasive.

\* \* \* \* \* \*

At trial, plaintiff elicited testimony from various experts on U.K. tax law concerning the U.K. imputation system and certain aspects of the US–UK Income Tax Treaty.[9] Plaintiff also introduced affidavits from two former members of the U.S. negotiating team containing their views as to the intent of the U.S. and U.K. treaty negotiators in 1975 and brief comments on the Technical Explanation, as well as internal U.S. government memoranda summarizing meetings held at Treasury in 1977, to discuss the Technical Explanation,[10] and at IRS in 1980, to discuss Rev.Proc. 80–18.[11] The court concludes, however, that the foregoing items are entitled to little evidentiary weight in this action.

The Patrick and Hannes affidavits, statements of former U.S. government agents involved in the negotiations, cannot, in this court's judgment, take precedence over the Technical Explanation and other official pronouncements of the United States and the United Kingdom as evidence of the intent of the treaty parties. To the extent the affidavits and the official pronouncements are inconsistent, the affidavits must give way. *See generally Coplin v. United States*, 6 Cl.Ct. 115, 128 (1984), rev'd on other grounds, 761 F.2d 688 (Fed.Cir.1985) aff'd, sub nom., *O'Connor v. United States*, 479 U.S. 27, 107 S.Ct. 347, 93 L.Ed.2d 206 (1986); *Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 370 (1985). This same reasoning applies to the internal U.S. government memoranda, which will not be accorded greater weight than the official U.S. government pronouncements which were issued thereafter. In short, plaintiff has failed to convince this court that there is sufficient ambiguity in the treaty language and associated official pronouncements necessitating our resort to the foregoing evidence as a means of construing the intent of the treaty parties.

The testimony of plaintiff's witnesses, while very illuminating as to U.K. law, is of little assistance to the court in interpreting Articles 10 and 23 of the US–UK Income Tax Treaty. Principles of U.K. tax law were not incorporated into treaty Articles 10 and 23 and did not underlie the U.S. Senate's understanding of the Convention in the ratification process. Moreover, the Competent Authority Agreement expressly confirmed that the application and timing of the Article 23(1)(c) tax credit was a matter of U.S. law. The testimony received by the court under offer of proof, concerning alleged misstatements of U.K. law in the Technical Explanation, is likewise unavailing to plaintiff's cause. The Technical Explanation formed the basis of the Senate's intent in ratifying the Convention, and no objection thereto was voiced by the U.K. prior to its own ratification. Regardless of the accuracy of the Technical Explanation in describing U.K. law, it is clear that this document, not U.K. law, is determinative of the intent of the treaty parties.

### CONCLUSION

For the reasons discussed herein, the court finds that plaintiff has not established its entitlement to the indirect foreign

---

**9.** Over defendant's objection, the court also heard testimony under an offer of proof pursuant to Rule 103(a)(2) of the Federal Rules of Evidence regarding alleged misstatements of U.K. law in parts of the Technical Explanation covering Articles 10 and 23 of the Convention. The court admits this testimony into evidence to be accorded its due weight.

**10.** Plaintiff's Exhibits 28 and 29, Affidavits of Robert J. Patrick, Jr.; Plaintiff's Exhibit 30, Affidavit of Steven P. Hannes.

**11.** Plaintiff's Exhibit 31.

tax credit for 1974 claimed under Article 23(1)(c) of the US–UK Income Tax Treaty. Having determined that there is no just reason for delay, the Court hereby directs the Clerk to enter judgment dismissing that part of the complaint seeking a refund of federal income taxes in the amount of $1,826,222.

With respect to plaintiff's other causes of action, the parties shall advise the court within 60 days as to their plans for further proceedings.

No costs.

IT IS SO ORDERED.