113 T.C. No. 17


UNITED STATES TAX COURT


COMPAQ COMPUTER CORPORATION
AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24238-96.              Filed September 21, 1999.


        In a prearranged transaction designed to eliminate
typical market risks, P purchased and immediately
resold American Depository Receipts (ADR's) of a
foreign corporation on the floor of the NYSE.  As a
result of the transaction, P was the shareholder of
record of 10 million ADR's on the dividend record date
and received a dividend of $22,545,800 less withheld
foreign taxes of $3,381,870.  P also recognized a
$20,652,816 capital loss on the sale of the ADR's,
which was offset against previously  realized capital
gains.  The net cash-flow from the transaction, without
regard to tax consequences, was a $1,486,755 loss.
<u>Held</u>:  The transaction lacked economic substance, and
the foreign tax credit claimed by P will be disallowed.
<u>Held further</u>:  An accuracy-related penalty will be
imposed due to petitioner's negligence.

Mark A. Oates, John M. Peterson, Jr., James M. O'Brien, Owen P. Martikan, Paul E. Schick, Robert S. Walton, Tamara L. Frantzen, Erika S. Schechter, A. Duane Webber, David A. Waimon, Lafayette G. Harter III, and Steven M. Surdell, for petitioner.

Dennis M. Kelly, Ginny Y. Chung, and Rebecca I. Rosenberg, for respondent.

COHEN, Chief Judge:  The issues addressed in this opinion are whether petitioner's purchase and resale of American Depository Receipts (ADR's) in 1992 lacked economic substance and whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a).  (In a separate opinion, Compaq Computer Corp. & Subs. v. Commissioner, T.C. Memo. 1999-220, we held that income relating to printed circuit assemblies should not be reallocated under section 482 to petitioner from its Singapore subsidiary for its 1991 and 1992 fiscal years. Petitioner has also filed a Motion for Summary Judgment on the issue of whether petitioner is entitled to foreign tax credits for certain United Kingdom Advance Corporation Tax payments.) Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Since 1982, petitioner has been engaged in the business of designing, manufacturing, and selling personal computers. Details concerning petitioner's business operations are set forth in T.C. Memo. 1999-220 and are not repeated here.

Petitioner occasionally invested in the stock of other computer companies. In 1992, petitioner held stock in Conner Peripherals, Inc. (Conner Peripherals), a publicly traded, nonaffiliated computer company. Petitioner sold the Conner Peripherals stock in July 1992, recognizing a long-term capital gain of $231,682,881.

Twenty-First Securities Corporation (Twenty-First), an investment firm specializing in arbitrage transactions, learned of petitioner's long-term capital gain from the sale of Conner Peripherals, and on August 13, 1992, Steven F. Jacoby (Jacoby), a broker and account executive with Twenty-First, mailed a letter to petitioner soliciting petitioner's business. The letter stated that Twenty-First "has uncovered a number of strategies that take advantage of a capital gain", including a Dividend Reinvestment Arbitrage Program (DRIP) and a "proprietary variation on the DRIP", the ADR arbitrage transaction (ADR transaction).

An ADR (American Depository Receipt) is a trading unit issued by a trust, which represents ownership of stock in a foreign corporation that is deposited with the trust. ADR's are the customary form of trading foreign stocks on U.S. stock exchanges, including the New York Stock Exchange (NYSE). The ADR transaction involves the purchase of ADR's "cum dividend", followed by the immediate resale of the same ADR's "ex dividend". "Cum dividend" refers to a purchase or sale of a share of stock or an ADR share with the purchaser entitled to a declared dividend (settlement taking place on or before the record date of the dividend). "Ex dividend" refers to the purchase or sale of stock or an ADR share without the entitlement to a declared dividend (settlement taking place after the record date).

James J. Tempesta (Tempesta) was an assistant treasurer in petitioner's treasury department in 1992. He received his undergraduate degree in philosophy and government from Georgetown University and his master's degree in finance and accounting from the University of Texas. Tempesta's responsibilities in petitioner's treasury department included the day-to-day investment of petitioner's cash reserves, including the evaluation of investment proposals from investment bankers and other institutions. He was also responsible for writing petitioner's investment policies that were in effect during September 1992. Petitioner's treasury department primarily

focused on capital preservation, typically investing in overnight deposits, Eurodollars, commercial paper, and tax-exempt obligations.

On September 15, 1992, Tempesta and petitioner's treasurer, John M. Foster (Foster), met with Jacoby and Robert N. Gordon (Gordon), president of Twenty-First, to discuss the strategies proposed in the August 13, 1992, letter from Twenty-First. In a meeting that lasted approximately an hour, Jacoby and Gordon presented the DRIP strategy and the ADR transaction. Following the meeting, Tempesta and Foster discussed the transactions with Darryl White (White), petitioner's chief financial officer. They decided not to engage in the DRIP investment but chose to go forward with the ADR transaction, relying primarily on Tempesta's recommendation. Tempesta notified Twenty-First of this decision on September 16, 1992.

Although cash-flow was generally important to petitioner's investment decisions, Tempesta did not perform a cash-flow analysis before agreeing to take part in the ADR transaction. Rather, Tempesta's investigation of Twenty-First and the ADR transaction, in general, was limited to telephoning a reference provided by Twenty-First and reviewing a spreadsheet provided by Jacoby that analyzed the transaction. Tempesta shredded the spreadsheet a year after the transaction.

Joseph Leo (Leo) of Twenty-First was responsible for arranging the execution of the purchase and resale trades of ADR's for petitioner. Bear Stearns & Co., Inc. (Bear Stearns), was used as the clearing broker for petitioner's trades, and the securities selected for the transaction were ADR shares of Royal Dutch Petroleum Company (Royal Dutch). Royal Dutch ordinary capital shares were trading in 21 organized markets throughout the world in 1992, but primarily on the NYSE in the United States as ADR's. Before agreeing to enter into the transaction, petitioner had no specific knowledge of Royal Dutch, and Tempesta's research of Royal Dutch was limited to reading in the Wall Street Journal that Royal Dutch declared a dividend and to observing the various market prices of Royal Dutch ADR's.

In preparation for the trades, Leo determined the number of Royal Dutch ADR's to be included in each purchase and resale trade. He also selected the market prices to be paid, varying the prices in different trades so the blended price per share equaled the actual market price plus the net dividend. Leo did not, however, discuss the size of the trades or the prices selected for the trades with any employee or representative of petitioner. Leo also chose to purchase the Royal Dutch ADR's from Arthur J. Gallagher and Company (Gallagher). Gallagher had been a client of Twenty-First since 1985 and participated in various investment strategies developed by Twenty-First over the

years. During 1991, Gallagher participated in several ADR transaction trades as the purchaser of the ADR's. Tempesta had no knowledge of the identity of the seller of ADR's. He only knew that the seller was a client of Twenty-First.

On September 16, 1992, Leo instructed ABD-N.Y., Inc. (ABD), to purchase 10 million Royal Dutch ADR's on petitioner's behalf from Gallagher on the floor of the NYSE. He also instructed ABD to resell the 10 million Royal Dutch ADR's to Gallagher immediately following the purchase trades. The purchase trades were made in 23 separate cross-trades of approximately 450,000 ADR's each with special "next day" settlement terms pursuant to NYSE rule 64. The aggregate purchase price was $887,577,129, cum dividend.

ABD executed the 23 sale trades, selling the Royal Dutch ADR's back to Gallagher, immediately following the related purchase trade. Accordingly, each purchase trade and its related sale trade were completed before commencing the next purchase trade. The sales transactions, however, had regular settlement terms of 5 days, and the aggregate sales price was $868,412,129, ex dividend. The 23 corresponding purchase and resale trades were completed in about an hour between approximately 2:58 p.m. and 4:00 p.m.

Leo had instructed the ABD floor brokers to execute the trades only if the prices selected were within the range of the

current market prices. Thus, when, between the sixth and seventh trades, the market price changed, Leo modified the price for subsequent trades to compensate for the change. In addition, NYSE rule 76 required an open outcry for each cross-trade, and NYSE rule 72 allowed other traders on the floor or the "specialist" responsible for making the cross-trades to break up the transaction by taking all or part of the trade. However, for cross-trades priced at the market price, there was no incentive to break up the transaction.

Pursuant to the "next day" settlement rules, the purchase cross-trades were settled between petitioner and Gallagher on September 17, 1992. On that date, Gallagher's account with Bear Stearns was credited $887,547,543 for the purchase trades, including a reduction for Securities and Exchange Commission fees (SEC fees) of $29,586. Gallagher was subsequently reimbursed for the SEC fees. Also on September 17, 1992, petitioner transferred $20,651,996 to Bear Stearns, opening a margin account.

On September 18, 1992, at 10:47 a.m., petitioner complied with the applicable margin requirements, transferring $16,866,571 to its margin account with Bear Stearns. The margin requirement for purchase and sale transactions completed on the same day was 50 percent of the purchase price of the largest trade executed on that day. It was not necessary to make payments for each completed trade. Accordingly, this wire transfer was made by

petitioner to demonstrate its financial ability to pay under the applicable margin rules.  The $16,866,571 was transferred back to petitioner that same day at 1:39 p.m.

Pursuant to the regular settlement rules, the resale cross-trades were settled between petitioner and Gallagher on September 21, 1992.  The total selling price credited to petitioner's account with Bear Stearns was $868,412,129 (before commissions and fees).  Expenses incurred by petitioner with respect to the purchase and resale trades included:  SEC fees of $28,947, interest of $457,846, a margin writeoff of $37, and commissions of $998,929.  Petitioner had originally agreed to pay Twenty-First commissions of $1,000,000, but Twenty-First adjusted its commissions by $1,070.55 to offset computational errors in calculating some of the purchase trades.

Due to the different settlement dates, petitioner was the shareholder of record of 10 million Royal Dutch ADR's on the dividend record date and was therefore entitled to a dividend of $22,545,800.  On October 2, 1992, Royal Dutch paid the declared dividend to shareholders of record as of September 18, 1992, including petitioner.  Contemporaneously with the dividend, a corresponding payment was made to the Netherlands Government representing withholding amounts for dividends paid to U.S. residents within the meaning of the United States-Netherlands Tax Treaty, Convention With Respect to Taxes on Income and Certain

Other Taxes, Apr. 29, 1948, U.S.-Neth., art. VII, para. 1, 62 Stat. 1757, 1761. The withholding payment equaled 15 percent of the declared dividend, $3,381,870. Accordingly, a net dividend of $19,163,930 was deposited into petitioner's margin account at Bear Stearns and wired to petitioner on October 2, 1992.

On its 1992 Federal income tax return, petitioner reported the loss on the purchase and resale of Royal Dutch ADR's as a short-term capital loss in the amount of $20,652,816, calculated as follows:

| | |
|---|---|
| Adjusted basis | $888,535,869 |
| Amount realized | 867,883,053 |
| Capital loss | $ 20,652,816 |

Petitioner also reported dividend income in the amount of $22,546,800 and claimed a foreign tax credit of $3,382,050 for the income tax withheld and paid to the Netherlands Government with respect to the dividend.

### ULTIMATE FINDINGS OF FACT

Every aspect of petitioner's ADR transaction was deliberately predetermined and designed by petitioner and Twenty-First to yield a specific result and to eliminate all economic risks and influences from outside market forces on the purchases and sales in the ADR transaction.

Petitioner had no reasonable possibility of a profit from the ADR transaction without the anticipated Federal income tax consequences.

Petitioner had no business purpose for the purchase and sale of Royal Dutch ADR's apart from obtaining a Federal income tax benefit in the form of a foreign tax credit while offsetting the previously recognized capital gain.

OPINION

Respondent argues that petitioner is not entitled to the foreign tax credit because petitioner's ADR transaction had no objective economic consequences or business purpose other than reduction of taxes. Petitioner argues that it is entitled to the foreign tax credit because it complied with the applicable statutes and regulations, that the transaction had economic substance, and that, in any event, the economic substance doctrine should not be applied to deny a foreign tax credit.

In Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978), the Supreme Court stated that "a genuine multiple-party transaction with economic substance * * * compelled or encouraged by business or regulatory realities, * * * imbued with tax-independent considerations, and * * * not shaped solely by tax-avoidance features" should be respected for tax purposes. Innumerable cases demonstrate the difference between (1) closing out a real economic loss in order to minimize taxes or arranging a contemplated business transaction in a tax-advantaged manner and (2) entering into a prearranged loss transaction designed solely for the reduction of taxes on unrelated income. In the

former category are <u>Cottage Sav. Association v. Commissioner</u>, 499 U.S. 554 (1991); and <u>Esmark, Inc. & Affiliated Cos. v. Commissioner</u>, 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989). In the latter category are <u>ACM Partnership v. Commissioner</u>, 157 F.3d 231 (3d Cir. 1998), affg. in part T.C. Memo. 1997-115; <u>Goldstein v. Commissioner</u>, 364 F.2d 734 (2d Cir. 1966); and <u>Friendship Dairies, Inc. v. Commissioner</u>, 90 T.C. 1054 (1988). Referring to tax shelter transactions in which a taxpayer seeks to use a minimal commitment of funds to secure a disproportionate tax benefit, the Court of Appeals for the Seventh Circuit stated, in <u>Saviano v. Commissioner</u>, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983):

> The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. * * *

Petitioner repeatedly argues, and asks the Court to find, that it could not have had a tax savings or tax benefit purpose in entering into the ADR transaction because:

> In this case, a tax savings or tax benefit purpose cannot be attributed to Compaq because Compaq did not enjoy any tax reduction or other tax benefit from the transaction. Compaq's taxable income <u>increased</u> by approximately $1.9 million as a result of the Royal Dutch ADR arbitrage. Compaq's worldwide tax liability <u>increased</u> by more than $640,000 as a direct result of the Royal ADR arbitrage. The reason for this increase

in income taxes is obvious--Compaq realized a net profit with respect to the Royal Dutch ADR arbitrage. That net profit, appropriately, was subject to tax.

Petitioner's calculation of its alleged profit is as follows:

```
ADR transaction:
   ADR purchase trades          ($887,577,129)
   ADR sale trades                868,412,129
     Net cash from ADR transaction          ($19,165,000)
Royal Dutch dividend                          22,545,800
Transaction costs                             (1,485,685)
PRETAX PROFIT                                 $1,895,115
```

Petitioner asserts:

> Stated differently, the reduction in income tax received by the United States was not the result of a reduction in income tax paid by Compaq. Each dollar of income tax paid to the Netherlands was just as real, and was the same detriment to Compaq, as each dollar of income tax paid to the United States. Even Respondent's expert acknowledged this detriment, and that Compaq's worldwide income tax increased as a result of the Royal Dutch ADR arbitrage. A "tax benefit" can be divined from the transaction only if the income tax paid to the Netherlands with respect to Royal Dutch dividend is ignored for purposes of computing income taxes paid, but is included as a credit in computing Compaq's U.S. income tax liability. Such a result is antithetical to the foreign tax credit regime fashioned by Congress.

> In the complete absence of any reduction in income tax, it is readily apparent that Compaq could not have engaged in the transaction solely for the purpose of achieving such an income tax reduction.

Petitioner's rationale is that it paid $3,381,870 to the Netherlands through the withheld tax and paid approximately $640,000 in U.S. income tax on a reported "pretax profit" of approximately $1.9 million. (The $640,000 amount is petitioner's

approximation of U.S. income tax on $1.9 million in income.) If we follow petitioner's logic, however, we would conclude that petitioner paid approximately $4 million in worldwide income taxes on that $1.9 million in profit.

Petitioner cites several cases, including Levy v. Commissioner, 91 T.C. 838, 859 (1988); Gefen v. Commissioner, 87 T.C. 1471, 1492 (1986); Pearlstein v. Commissioner, T.C. Memo. 1989-621; and Rubin v. Commissioner, T.C. Memo. 1989-484, that conclude that the respective transactions had economic substance because there was a reasonable opportunity for a "pretax profit". These cases, however, merely use "pretax profit" as a shorthand reference to profit independent of tax savings, i.e., economic profit. They do not involve situations, such as we have in this case, where petitioner used tax reporting strategies to give the illusion of profit, while simultaneously claiming a tax credit in an amount (nearly $3.4 million) that far exceeds the U.S. tax (of $640,000) attributed to the alleged profit, and thus is available to offset tax on unrelated transactions. Petitioner's tax reporting strategy was an integrated package, designed to produce an economic gain when--and only when--the foreign tax credit was claimed. By reporting the gross amount of the dividend, when only the net amount was received, petitioner created a fictional $1.9 million profit as a predicate for a $3.4 million tax credit.

While asserting that it made a "real" payment to the Netherlands in the form of the $3,381,870 withheld tax, petitioner contends that that withholding tax should be disregarded in determining the U.S. tax effect of the transaction and the economic substance of the transaction.  Respondent, however, persuasively demonstrates that petitioner would incur a prearranged economic loss from the transaction but for the foreign tax credit.

The following cash-flow analysis demonstrates the inevitable economic detriment to petitioner from engaging in the ADR transaction:

```
Cash-flow from ADR transaction:
  ADR purchase trades          ($887,577,129)
  ADR sale trades                868,412,129
   Net cash from ADR transaction              ($19,165,000)

Cash-flow from dividend:
  Gross dividend                22,545,800
  Netherlands withholding tax   (3,381,870)
   Net cash from dividend                        19,163,930
OFFSETTING CASH-FLOW RESIDUAL                        (1,070)

Cash-flow from transaction costs:
  Commissions                  (1,000,000)
  Less:  Adjustment                 1,071
  SEC fees                       (28,947)
  Margin writeoff                      37
  Interest                      (457,846)
   Net cash from transaction costs              (1,485,685)

   NET ECONOMIC LOSS                           ($1,486,755)
```

The cash-flow deficit arising from the transaction, prior to use of the foreign tax credit, was predetermined by the careful and

tightly controlled arrangements made between petitioner and Twenty-First. The scenario was to "capture" a foreign tax credit by timed acquisition and sale of ADR's over a 5-day period in which petitioner bought ADR's cum dividend from Gallagher and resold them ex dividend to Gallagher. Petitioner was acquiring a foreign tax credit, not substantive ownership of Royal Dutch ADR's. See Friendship Dairies, Inc. v. Commissioner, supra at 1067.

Petitioner argues that there were risks associated with the ADR transaction, but neither Tempesta nor any other representative of petitioner conducted an analysis or investigation regarding these alleged concerns. Transactions that involve no market risks are not economically substantial transactions; they are mere tax artifices. See Yosha v. Commissioner, 861 F.2d 494, 500-501 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). Tax-motivated trading patterns generally indicate a lack of economic substance. See Sheldon v. Commissioner, 94 T.C. 738, 766, 769 (1990). The purchase and resale prices were predetermined by Leo, and the executing floor brokers did not have authority to deviate from the predetermined prices even if a price change occurred. In addition, the ADR transaction was divided into 23 corresponding purchase and resale cross-trades that were executed in succession, almost simultaneously, and within an hour on the

floor of the NYSE. Thus, there was virtually no risk of price fluctuation. Special next-day settlement terms and large blocks of ADR's were also used to minimize the risk of third parties breaking up the cross-trades, and, because the cross-trades were at the market price, there was no risk of other traders breaking up the trades. None of the outgoing cash-flow resulted from risks. Accordingly, we have found that this transaction was deliberately predetermined and designed by petitioner and Twenty-First to yield a specific result and to eliminate all market risks.

To satisfy the business purpose requirement of the economic substance inquiry, "the transaction must be rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation." AMC Partnership v. Commissioner, T.C. Memo. 1997-115, affd. in part, revd. in part, and remanded 157 F.3d 231 (3d Cir. 1998); see also Levy v. Commissioner, supra at 854. This inquiry takes into account whether the taxpayer conducts itself in a realistic and legitimate business fashion, thoroughly considering and analyzing the ramifications of a questionable transaction, before proceeding with the transaction. See UPS of Am. v. Commissioner, T.C. Memo. 1999-268.

Petitioner contends that it entered into the ADR transaction as a short-term investment to make a profit apart from tax

savings, but the objective facts belie petitioner's assertions. The ADR transaction was marketed to petitioner by Twenty-First for the purpose of partially shielding a capital gain previously realized on the sale of Conner Peripherals stock. Petitioner's evaluation of the proposed transaction was less than businesslike with Tempesta, a well-educated, experienced, and financially sophisticated businessman, committing petitioner to this multimillion-dollar transaction based on one meeting with Twenty-First and on his call to a Twenty-First reference. As a whole, the record indicates and we conclude that petitioner was motivated by the expected tax benefits of the ADR transaction, and no other business purpose existed.

Petitioner also contends that the ADR transaction does not warrant the application of the economic substance doctrine because the foreign tax credit regime completely sets forth Congress' intent as to allowable foreign tax credits. Petitioner argues that an additional economic substance requirement was not intended by Congress and should not be applied in this case.

Congress creates deductions and credits to encourage certain types of activities, and the taxpayers who engage in those activities are entitled to the attendant benefits. See, e.g., Leahy v. Commissioner, 87 T.C. 56, 72 (1986); Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). The foreign tax credit serves to prevent double taxation and to facilitate international

business transactions.  No bona fide business is implicated here, and we are not persuaded that Congress intended to encourage or permit a transaction such as the ADR transaction, which is merely a manipulation of the foreign tax credit to achieve U.S. tax savings.

Finally, petitioner asserts that the enactment of section 901(k) by the Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1053(a), 111 Stat. 941, also indicates that Congress did not intend for the economic substance doctrine to apply under the facts of this case.  Section 901(k)(1) provides that a taxpayer must hold stock (or an ADR) for at least 16 days of a prescribed 30-day period including the dividend record date, in order to claim a foreign tax credit with respect to foreign taxes withheld at the source on foreign dividends.  If the taxpayer does not meet these holding requirements, the taxpayer may claim a deduction for the foreign taxes paid if certain other requirements are met.

Section 901(k) does not change our conclusion in this case. That provision was passed in 1997 and was effective for dividends paid or accrued after September 4, 1997.  The report of the Senate Finance Committee indicates that "No inference is intended as to the treatment under present law of tax-motivated transactions intended to transfer foreign tax credit benefits." S. Rept. 105-33, 175, 177 (1997).  A transaction does not avoid

economic substance scrutiny because the transaction predates a statute targeting the specific abuse.  See, e.g., Krumhorn v. Commissioner, 103 T.C. 29, 48-50 (1994); Fox v. Commissioner, supra at 1026-1027.  Accordingly, section 901(k), enacted 5 years after the transaction at issue, has no effect on the outcome of this case.

Accuracy-Related Penalty

Respondent determined that petitioner is liable for the section 6662(a) penalty for 1992.  Section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b).  Respondent asserts that the underpayment attributable to the ADR transaction was due to negligence.  See sec. 6662(b)(1).  "Negligence" includes a failure to make a reasonable attempt to comply with provisions of the internal revenue laws or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances.  See sec. 6662(c); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964); sec. 1.6662-3(b)(1), Income Tax Regs.  Petitioner bears the burden of proving that respondent's determinations are erroneous.  See Rule 142(a); Freytag v. Commissioner, 904 F.2d 1011, 1017 (5th Cir. 1990), affg. 89 T.C. 849, 887 (1987), affd. 501 U.S. 868 (1991).

The accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion of an underpayment and that the taxpayer acted in good faith with respect to such portion.  See sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess the proper tax liability for the year.  See id.

Respondent argues that petitioner is liable for the accuracy-related penalty because petitioner negligently disregarded the economic substance of the ADR transaction; petitioner failed to meet its burden of proving that the underpayment was not due to negligence; and petitioner failed to offer evidence that there was reasonable cause for its return position for the ADR transaction or that it acted in good faith with respect to such item.  Petitioner argues that there is no basis for a negligence penalty because the return position was reasonable, application of the economic substance doctrine to the ADR transaction is "inherently imprecise", and application of the economic substance doctrine to disregard a foreign tax credit raises an issue of first impression.  We agree with respondent.

In this case, Tempesta, Foster, and White were sophisticated professionals with investment experience and should have been alerted to the questionable economic nature of the ADR transaction. They, however, failed to take even the most rudimentary steps to investigate the bona fide economic aspects of the ADR transaction. See Freytag v. Commissioner, supra. As set forth in the findings of fact, petitioner did not investigate the details of the transaction, the entity it was investing in, the parties it was doing business with, or the cash-flow implications of the transaction. Petitioner offered no evidence that it satisfied the "reasonable and ordinarily prudent person" standard or relied on the advice of its tax department or counsel. If any communications occurred in which consideration was given to the correctness of petitioner's tax return position when the return was prepared and filed, petitioner has chosen not to disclose those communications. We conclude that petitioner was negligent, and the section 6662(a) penalty is appropriately applied.

Our holding in this opinion will be incorporated into the decision to be entered in this case when all other issues are resolved.