113 T.C. No. 25

UNITED STATES TAX COURT

COMPAQ COMPUTER CORPORATION AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24238-96.                    Filed November 18, 1999.

H, a U.K. corporation, paid a dividend to P, its
U.S. parent.  Upon payment of the dividend, H, pursuant
to the law of the United Kingdom, became liable for and
paid advance corporation tax (ACT) and became entitled
to a credit against its U.K. corporate tax.  H
allocated the U.K. credit to its two wholly owned
subsidiaries, S1 and S2, which used the U.K. credit
against their respective mainstream corporate tax
liabilities.  Pursuant to I.R.C. sec. 901(a), P claimed
a foreign tax credit for the ACT paid by H.
     <u>Held</u>:  Pursuant to Article 23(c)(1) of the U.S.-
U.K. Convention, the payor of the ACT is the
corporation that pays the dividend and corresponding
ACT and not the corporation that uses the corresponding
U.K. credit against its U.K. tax liability.
Accordingly, P is entitled to claim a foreign tax
credit pursuant to I.R.C. sec. 901(a) for the ACT paid
by H.  <u>Held</u>, <u>further</u>, the U.K. credit allocated by H to

S1 and S2 and used by them against their U.K. tax is not a subsidy within the meaning of I.R.C. sec. 901(i).

Mark A. Oates, John M. Peterson, Jr., James M. O'Brien, Owen P. Martikan, Paul E. Schick, Robert S. Walton, Tamara L. Frantzen, Erika S. Schechter, Allen Duane Webber, David A. Waimon, Lafayette G. Harter, III, and Steven M. Surdell, for petitioners.

Allan E. Lang, Sandra K. Robertson, and Barbara A. Felker, for respondent.


OPINION

WELLS, Judge:  In the instant case, the parties filed cross-motions for summary judgment pursuant to Rule 121(a).[1]  The issue[2] presented by the parties' summary judgment motions is whether Compaq Computer Corp. (petitioner) is entitled to foreign

---

[1]    Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1992, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]    The instant case involves several issues for which the parties filed separate briefs.  In an opinion issued July 2, 1999, we addressed the issue of whether income relating to printed circuit assemblies should be reallocated under sec. 482 to petitioner from its Singapore subsidiary for its 1991 and 1992 fiscal years.  See Compaq Computer Corp. & Subs. v. Commissioner, T.C. Memo. 1999-220.  In an opinion issued Sept. 21, 1999, we addressed the issue of whether a foreign tax credit resulting from certain ADR transactions should be allowed.  See Compaq Computer Corp. & Subs. v. Commissioner, 113 T.C. __ (1999).

tax credits pursuant to section 901(a) for certain U.K. advance corporation tax (ACT) payments.[3]

Summary judgment may be granted if the pleadings and other materials demonstrate that no genuine issue exists as to any material fact and that a decision may be rendered as a matter of law.  See Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  The record shows and the parties do not dispute that there is no genuine issue as to any material fact.  Accordingly, we may render judgment on the issue in the instant case as a matter of law. See Rule 121(b).

<u>Background</u>

Petitioner is a Delaware corporation with its principal place of business in Houston, Texas.  Petitioner owns 100 percent of the issued and outstanding stock of Compaq Computer Group, Ltd. (Compaq U.K.), a corporation organized and existing under the laws of the United Kingdom.  Compaq U.K. owns 100 percent of the issued and outstanding stock of Compaq Computer Manufacturing, Ltd. (CCML), and Compaq Computer, Ltd. (CCL) (hereinafter we will sometimes refer to CCML and CCL collectively

---

[3]  The ACT was first introduced by the Finance Act, 1972.  The Income and Corporation Taxes Act, 1988, which was in effect during the year in issue, made only minor changes with respect to the ACT.  The ACT was abolished, effective for distributions after Apr. 1, 1999, by the Finance Act, 1998, sec. 31.

as the U.K. Subs.), which are corporations organized and existing under the laws of the United Kingdom.

During 1992, a corporation that resided in the United Kingdom was required to pay tax to the United Kingdom at the rate of 33 percent on its corporate income (mainstream tax).  See Finance (No. 2) Act, 1992, sec. 21.  Additionally, a corporation that paid a dividend to its shareholders was obligated to pay to the United Kingdom ACT.  See Income and Corporation Taxes Act, 1988, sec. 14(1) (Eng.)

Generally, upon payment of the ACT, a U.K. corporation becomes entitled to a credit against mainstream tax equal to the amount of the ACT (corporate offset).  See id. sec. 239(1).  If the corporate offset exceeds the amount of the corporation's mainstream tax, the corporation can carry the corporate offset back 6 years or forward indefinitely.  See id. sec. 239(3) and (4).  A corporation that cannot use the corporate offset in the current year, rather than carrying the corporate offset back or forward, can elect to allocate the corporate offset to one or more of its controlled subsidiaries.[4]  See id. sec. 240 (1)

One exception to the general terms of the ACT is that a corporation is not required to pay ACT on "franked investment

---

[4]    A subsidiary is controlled if the parent corporation owns more than 51 percent of the outstanding stock.  See Income and Corporation Taxes Act, 1988, sec. 240(10).

income", which is a distribution on which ACT has already been paid.  Id. secs. 238(1), 241(1).  Additionally, if a controlled subsidiary makes a distribution to a parent, the parties can elect whether the subsidiary will pay ACT on the distribution or the parent will pay ACT on subsequent distributions of such funds.  See id. sec. 247(4)

Additionally, a U.K. shareholder, upon receipt of the dividend, becomes entitled to a credit (shareholder credit) against its individual taxes.  The shareholder credit is a portion of the ACT paid by the corporation.  See id. sec. 231(1) Absent a treaty provision to the contrary, the shareholder credit is not available to nonresidents of the United Kingdom.  See id.

The United States and the United Kingdom entered into the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains and Three Protocols, Dec. 31, 1975-Mar. 15, 1979, U.S.-U.K., 31 U.S.T. (Part 6) 5668, T.I.A.S. 9682 (U.S.-U.K. Convention).  Article 10 of the U.S.-U.K. Convention, 31 U.S.T. at 5677, provides that shareholders owning more than 10 percent of the outstanding stock of a U.K. corporation are entitled to a payment of one-half of the shareholder credit to which an individual U.K. resident shareholder would have been entitled. Shareholders owning less than 10 percent of the outstanding stock of a U.K. corporation are entitled to a payment of the full

amount of the shareholder credit to which an individual U.K.

resident shareholder would have been entitled.[5]

---

[5] The relevant parts of Article 10 of the U.S.-U.K. Convention provide:

Article 10
Dividends

(2) As long as an individual resident in the United Kingdom is entitled under United Kingdom law to a tax credit in respect of dividends paid by a corporation which is resident in the United Kingdom, paragraph (1) of this Article shall not apply.  * * *

(a) In the case of dividends paid by a corporation which is a resident of the United Kingdom:

(i) to a United States corporation which either alone or together with one or more associated corporations controls, directly or indirectly, at least 10 per cent of the voting stock of the corporation which is a resident of the United Kingdom paying the dividend, the United States corporation shall be entitled to a payment from the United Kingdom of a tax credit equal to one-half of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 5 per cent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such corporation;

During 1992, Compaq U.K. declared and paid a dividend of ^11,800,000 to petitioner.  As a result of paying the dividend, Compaq U.K. became liable for and paid ACT in the amount of ^3,933,333.  Upon payment of the ACT, Compaq U.K. became entitled to a corporate offset against its mainstream corporate income tax.  Additionally, pursuant to Article 10 of the U.S.-U.K. Convention, petitioner became entitled to a payment from the United Kingdom equal to one-half of the shareholder credit to which an individual shareholder resident of the United Kingdom would have been entitled.

Compaq U.K. surrendered the corporate offset to the U.K. Subs. instead of using it against Compaq U.K. tax.  The U.K. Subs. used the corporate offset to reduce their 1992 U.K. mainstream tax liability.  The U.K. Subs. did not pay any dividends during 1992.

Petitioner, pursuant to Rev. Proc. 80-18, 1980-1 C.B. 623, modified by Rev. Proc. 81-58, 1981-2 C.B. 678; and Rev. Proc. 84-60, 1984-2 C.B. 504, and amplified and clarified by Rev. Proc. 90-61, 1990-2 C.B. 657, did not claim a foreign tax credit for the unrefunded portion of the ACT paid by Compaq U.K.  Following the opinion of the U.S. Court of Appeals for the Federal Circuit in Xerox Corp. v. United States, 41 F.3d 647 (Fed. Cir. 1994), revg. 14 Cl. Ct. 455 (1988), petitioner made an informal claim

for refund for additional foreign tax credits for the ACT
payment.  Respondent disallowed the refund.

Discussion

Section 901(a) allows a domestic corporation to claim a
foreign tax credit for taxes "deemed to have been paid under
sections 902 and 960."  Section 902 provides, inter alia:

> SEC. 902. DEEMED PAID CREDIT WHERE DOMESTIC
>          CORPORATION OWNS 10 PERCENT OR MORE OF
>          VOTING STOCK OF FOREIGN CORPORATION.
>
> (a) Taxes Paid by Foreign Corporation Treated as
> Paid by Domestic Corporation.--For purposes of this
> subpart, a domestic corporation which owns 10 percent
> or more of the voting stock of a foreign corporation
> from which it receives dividends in any taxable year
> shall be deemed to have paid the same proportion of
> such foreign corporation's post-1986 foreign income
> taxes as--
>
> > (1) the amount of such dividends
> > (determined without regard to section 78),
> > bears to
>
> > (2) such foreign corporation's post-1986
> > undistributed earnings.
>
> (b) Deemed Taxes Increased in Case of Certain 2nd
> and 3rd Tier Foreign Corporations.--
>
> > (1) 2nd tier.--If the foreign
> > corporation described in subsection (a)
> > (hereinafter in this section referred to as
> > the "1st tier corporation") owns 10-percent
> > or more of the voting stock of a 2nd foreign
> > corporation from which it receives dividends
> > in any taxable year, the 1st tier corporation
> > shall be deemed to have paid the same
> > proportion of such 2nd foreign corporation's
> > post-1986 foreign income taxes as would be
> > determined under subsection (a) if such 1st
> > tier corporation were a domestic corporation.

The parties disagree as to which corporation is the payor of the ACT and, consequently, disagree as to whether section 902(a) or 902(b) applies to the dividend received by petitioner during 1992. Petitioners contend that, for foreign tax credit purposes, the payor of the ACT is the corporation that pays the dividend and the corresponding ACT. Petitioners further contend that the subsequent use or allocation of the corporate offset is irrelevant. Petitioners, therefore, argue that they are entitled to a foreign tax credit under section 902(a) because, during 1992, petitioner received a dividend from a 10-percent-owned subsidiary that paid taxes to a foreign government during 1992.

Respondent disagrees with petitioners' contentions and argues that, for purposes of the foreign tax credit, the payor of the ACT is the corporation that uses the corporate offset. Accordingly, respondent argues that the U.K. Subs., rather than Compaq U.K., must be viewed as the payors of the ACT in 1992. Respondent further argues that, because the U.K. Subs. did not pay a dividend to Compaq U.K. during 1992, no portion of the ACT paid by the U.K. Subs. can be attributed, pursuant to section 902(b), to the dividend distributed in 1992 by Compaq U.K. to petitioner.

To support their respective positions, both parties rely on Article 23 of the U.S.-U.K. Convention, which addresses the foreign tax credit treatment of the ACT. The relevant portion of

Article 23 of the U.S.-U.K. Convention, 31 U.S.T. at 5685,

provides:

### Article 23
### Elimination of Double Taxation

(1) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), * * * in the case of a United States corporation owning at least 10 per cent of the voting stock of a corporation which is a resident of the United Kingdom from which it receives dividends in any taxable year, the United States shall allow credit for the appropriate amount of tax paid to the United Kingdom by that corporation with respect to the profits out of which such dividends are paid. Such appropriate amount shall be based upon the amount of tax paid to the United Kingdom, but the credit shall not exceed the limitations (for the purpose of limiting the credit to the United States tax on income from sources outside of the United States) provided by United States law for the taxable year. For the purposes of applying the United States credit in relation to tax paid to the United Kingdom:

*    *    *    *    *    *    *

(c) that amount of tax credit referred to in paragraph (2)(a)(i) of Article 10 (Dividends) which is not paid to the United States corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend shall be treated as an income tax imposed on the United Kingdom corporation paying the dividend.

Petitioners argue that the last sentence of Article 23(1)(c)

specifically designates the unrefunded portion of the ACT as an

income tax imposed on the corporation paying the dividend.

Respondent, on the other hand, argues that such language was

intended only to designate the taxpayer as the foreign corporation paying the dividend, as opposed to the domestic corporation receiving the dividend.

In Xerox Corp. v. United States, 14 Cl. Ct. 455 (1988), the U.S. Claims Court was presented with the same issue presented in the instant case. In Xerox, a first-tier U.K. subsidiary corporation paid a dividend to its U.S. parent corporation and allocated the corporate offset to second-tier U.K. subsidiary corporations. See id. at 460-461. The U.S. parent corporation claimed a foreign tax credit for the unrefunded portion of the ACT paid by the first-tier subsidiary. See id. The Claims Court found that the language of the U.S.-U.K. Convention did not support the taxpayer's contentions that the ACT paid by the first-tier subsidiary was creditable to the parent corporation without regard to the subsequent allocation of the corporate offset. See id. at 462. Rather, the Claims Court looked to the Technical Explanation of the U.S.-U.K. Convention (Technical Explanation), 1980-1 C.B. 455, Rev. Proc. 80-18, 1980-1 C.B. 623, and the Competent Authority Agreement which resulted from the exchange of correspondence between Mr. P.W. Fawcett and Mr. P.E. Coates pursuant to Article 25 of the U.S.-U.K. Convention to determine the intent of the parties negotiating the U.S.-U.K. Convention. See id. at 463-466. The Claims Court found that the intention of the parties negotiating the U.S.-U.K. Convention was

to treat the ACT as a separate tax only until the corporate offset was used; thereafter, the ACT must be viewed as subsumed into the mainstream tax. See id. at 467-468. The Claims Court further held that once a corporation allocated the corporate offset to its subsidiary, the subsidiary was to be considered the payor of the ACT for foreign tax credit purposes. See id. at 468.

On appeal, the U.S. Court of Appeals for the Federal Circuit reversed the Claims Court. The Court of Appeals held that the language of the U.S.-U.K. Convention was clear and allowed a foreign tax credit for the unrefunded portion of the ACT without regard to the use of the corporate offset. See Xerox Corp. v. United States, 41 F.3d at 660. The Court of Appeals also noted that various statements made by parties negotiating the treaty supported its reading of the treaty language. See id. at 654. As discussed in further detail below, we agree with the holding of the Court of Appeals for the Federal Circuit that the plain meaning of the treaty language provides that the payor of the ACT is the corporation that pays the dividend and the corresponding ACT, and that the subsequent use or allocation of the corporate offset does not alter this conclusion.

Regarding the interpretation of treaties, the Supreme Court has stated that "[T]reaties are the subject of careful consideration before they are entered into, and are drawn by

persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties." Rocca v. Thompson, 223 U.S. 317, 332 (1912). Consequently, "The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 180 (1982) (quoting Maximov v. United States, 373 U.S. 49, 54 (1963)).

In the instant case, we conclude that the clear import of the language of the U.S.-U.K. Convention favors petitioners' position. The treatment of the ACT shareholder credit was an important issue resolved by the U.S.-U.K. Convention. See S. Exec. Rept. 95-18, at 2 (1978), 1980-1 C.B. 411, 412 ("Of particular significance are the new provisions contained in the proposed treaty (1) which provide for a refund by the U.K. to U.S. portfolio and direct shareholders receiving dividends from British corporations of Advance Corporation Tax (ACT) paid by the distributing corporation (Article 10) and allow a U.S. foreign tax credit for the one-half of the ACT which is not refunded to U.S. direct corporate investors (Article 23)"). As the corporate offset is an important facet of the ACT regime, we believe that, had the high contracting parties intended for the shareholder credit to be linked to the corporate offset, Article 23(1)(c)

would have specifically provided for such a link. The high contracting parties, however, chose to treat the ACT as imposed on "the corporation paying the dividend", and we adhere to that language in our interpretation of the treaty.

Moreover, we find that the general structure of the U.S.-U.K. Convention evidences the signatories' intent not to link the availability of the shareholder credit to the corporate offset. Pursuant to Article 10(2), the United Kingdom is required to refund or pay to a 10-percent U.S. shareholder one-half of the ACT to which an individual U.K. resident shareholder would have been entitled. Such a refund is available to the 10-percent U.S. shareholder regardless of the use the U.K. corporation makes of the corporate offset.

Respondent argues that the U.S.-U.K. Convention is silent with respect to situations where the corporate offset is allocated to a subsidiary, and, therefore, the identity of the payor of the ACT must be resolved pursuant to the first sentence of Article 23(1): "In accordance with * * * the law of the United States". That law, respondent contends, is contained in the Technical Explanation.

The Technical Explanation, although it does not address the issue of the allocation of the corporate offset, states:

> ACT which reduces mainstream tax in any year or years shall be attributable to any accumulated profits of the year or years for which the mainstream tax is

reduced. Where ACT is used to offset mainstream tax, the offset will be viewed as a refund of the ACT initially allowed as a credit and as a tax paid in respect of the year for which the ACT is applied as an offset. Consequently, a reduction in the foreign tax credit for the year from which the ACT is carried must be made in accordance with section 905(c) of the Code. [Technical Explanation, 1980-1 C.B. at 473.]

The Technical Explanation's view of the ACT, as a tax, originally imposed but then refunded, upon the use of the corporate offset, is the basis of Rev. Proc. 80-18, 1980-1 C.B. at 625, which, in turn, states in relevant part:

Paragraph 1(c) of Article 23 provides, in addition, that the one-half of the ACT paid by a United Kingdom corporation that is not refunded to a U.S. direct investor and that would be credited or refunded to a United Kingdom individual resident is treated as an income tax imposed on the distributing United Kingdom corporation (rather than the U.S. shareholder). Under United Kingdom law, a United Kingdom corporation that pays ACT may, however, transfer to a related United Kingdom corporation the right to apply ACT against mainstream tax liability. Thus, for example, a United Kingdom subsidiary of a United Kingdom corporation may benefit from the parent's ACT payment by offsetting part or all of the ACT against its own liability for United Kingdom mainstream tax. In such a case, for U.S. foreign tax credit purposes and pursuant to Article 23, the parent corporation has not paid or accrued the unrefunded ACT offset against the subsidiary's mainstream tax and has contributed to the capital of the subsidiary an amount equal to the unrefunded ACT offset. The subsidiary is considered to have paid or accrued only mainstream tax paid or accrued in excess of the ACT offset, plus the amount of unrefunded ACT so offset.

According to respondent, the allocation of the corporate offset to a subsidiary must be viewed as a capital contribution of the unrefunded ACT from the parent to the subsidiary and, at such

time as the subsidiary applies the offset against its own liability for mainstream tax, payment by the subsidiary of the unrefunded portion of the ACT.

The Technical Explanation was not available to both contracting parties in the negotiation of the U.S.-U.K. Convention. Rather, it was prepared by the Department of the Treasury (Treasury) to aid Congress during the ratification process in understanding the U.S.-U.K. Convention. With regard to the Technical Explanation's approach to the ACT, S. Exec. Rept. 95-18, supra at 36-37, 1980-1 C.B. at 429, states:

> The Treasury's technical explanation also set forth a complex set of rules and examples intended to be used for purposes of determining the earnings to which ACT payments by a U.K. corporation are to be attributed for purposes of computing the indirect U.S. foreign tax credit.
>
>      *     *     *     *     *     *     *
>
> These rules raise difficult and complex issues. In recommending the ratification of the proposed treaty, the Committee does not intend that these rules necessarily serve as a model for future treaties. Further, in recommending the ratification of the treaty, the Committee does not intend to adopt or reject the amplifications of the foreign tax credit rules contained in the Treasury technical explanation. * * *

As to the Technical Explanation, the Court of Appeals for the Federal Circuit, in Xerox Corp. v. United States, 41 F.3d at 655-656, commented: "One may debate the meaning of this cool treatment of the Technical Explanation. What is clear, however,

is that the Treasury's position was not embraced by the Senate."
In the same vein, it is well established that a revenue procedure
is not a law binding upon the Court but is merely a statement of
the Commissioner's position.  See Helvering v. New York Trust
Co., 292 U.S. 455, 468 (1934); Casanova Co. v. Commissioner, 87
T.C. 214, 223 (1986).  Accordingly, we conclude that neither the
Technical Explanation nor Rev. Proc. 80-18, supra, is to be
considered "the law of the United States" for the purposes of the
first sentence of Article 23(1) of the U.S.-U.K. Convention.
Consequently, we hold that they present no reason for us to
deviate from the intention of the high contracting parties as
evidenced by the structure of the U.S.-U.K. Convention and by the
plain meaning of the language of Article 23(c)(1).[6]

Moreover, despite respondent's contentions to the contrary,
we conclude that it is proper to consider the proposition that
the corporation that pays the dividend and the corresponding ACT
is the payor of the ACT for purposes of the foreign tax credit as

---

[6]     Respondent has argued alternatively that the signatories to
the U.S.-U.K. Convention intended to link the shareholder credit
to the corporate offset and that such intent is evidenced in the
positions taken by the Technical Explanation, Rev. Proc. 80-18,
1980-1 C.B. 623, and the Competent Authority Agreement.  We note
that those documents were created after the negotiation of the
U.S.-U.K. Convention and that only Rev. Proc. 80-18, supra,
directly discusses the corporate offset.  Accordingly, we are
unpersuaded that the high contracting parties intended a result
contrary to the clear language and structure of the U.S.-U.K.
Convention.

being "In accordance with the provisions and subject to the limitations of the law of the United States."  In <u>Biddle v. Commissioner</u>, 302 U.S. 573, 382-383 (1938), the Supreme Court articulated the rule that, for U.S. foreign tax credit purposes, the taxpayer is the party who is liable for and charged with the payment of tax.  That mandate has been incorporated into the regulations at section 1.901-2(f)(1), Income Tax Regs.  In the instant case, the ACT is levied on the corporation that pays the dividend, regardless of whether that corporation or its subsidiary will make use of the corporate offset.  Accordingly, it is appropriate to consider the corporation that actually pays the dividend, and that is liable for payment of the ACT, as the payor of the ACT for foreign tax credit purposes regardless of the use of the corresponding U.K. credit.[7]

---

[7]    Respondent has further argued that, by disregarding the corporate offset in determining the payor of the ACT for foreign tax credit purposes, a U.K. corporation which is a subsidiary of a U.S. corporation could, theoretically, receive a dividend from one of its 10th-level subsidiaries.  Pursuant to the Income and Corporation Taxes Act, 1988, sec. 247, that 10th-level subsidiary could choose not to pay ACT on that dividend.  The U.K. subsidiary could then in turn remit that dividend to its U.S. parent, pay the ACT, and allocate the corporate offset to the 10th-level subsidiary.  The U.S. parent could then claim a foreign tax credit for the ACT paid by its U.K. subsidiary, notwithstanding that, had the ACT been paid by the 10th-level subsidiary, the ACT would not be creditable pursuant to the limitation of sec. 902(b).  Respondent's hypothetical is not based upon the facts of the instant case, and we decline to rule on it.

Lastly, respondent contends that, notwithstanding the treaty provisions, a foreign tax credit is not available to petitioner because use of the corporate offset by the U.K. Subs. results in a subsidy within the meaning of section 901(i).  The relevant parts of section 901(i) provide:

> SEC. 901(i).  Taxes Used to Provide Subsidies.-- Any income, war profits, or excess profits tax shall not be treated as a tax for purposes of this title to the extent--
>> (1) the amount of such tax is used (directly or indirectly) by the country imposing such tax to provide a subsidy by any means to the taxpayer, a related person (within the meaning of section 482), or any party to the transaction or to a related transaction, and
>
>> (2) such subsidy is determined (directly or indirectly) by reference to the amount of such tax, or the base used to compute the amount of such tax.

Section 1.901-2(e), Income Tax Regs., provides that a subsidy could include a credit provided to the taxpayer or to a related party.  Section 1.901-2(e)(ii), Income Tax Regs., however, further explains:  "The term 'subsidy' includes any benefit conferred, directly or indirectly, by a foreign country to one of the parties enumerated in paragraph (e)(3)(i)(A) of this section. Substance and not form shall govern in determining whether a subsidy exists."

Section 1.901-2(e)(4), Income Tax Regs., discusses the treatment of multiple levies, which are not considered subsidies, and provides:[8]

> (4) Multiple levies--(i) In general. If, under foreign law, a taxpayer's tentative liability for one levy (the "first levy") is or can be reduced by the amount of the taxpayer's liability for a different levy (the "second levy"), then the amount considered paid by the taxpayer to the foreign country pursuant to the second levy is an amount equal to its entire liability for that levy, and the remainder of the amount paid is considered paid pursuant to the first levy. This rule applies regardless of whether it is or is not likely that liability for one such levy will always exceed liability for the other such levy. * * *

We do not disagree with the regulation's prescription that substance rather than form controls the determination of whether a credit is a subsidy. Accordingly, we conclude that, under the rules of section 1.901-2(e)(4), Income Tax Regs., the ACT is comparable to a second levy, and the U.K. mainstream tax is comparable to a first levy. The amount paid by a corporation to the United Kingdom as ACT is therefore fully creditable, and the mainstream tax incurred by a U.K. corporation would be creditable only to the extent that it exceeded the ACT already paid. By analogy, we conclude that the allocation of the corporate offset

---

[8] We note that sec. 1.901-2(e)(4)(ii), Income Tax Regs., is reserved for integrated tax systems. The inclusion of such reserved space within the section on multiple levies instead of within the section on subsidies indicates that Treasury must also believe that such systems are closer to multiple levies than subsidies.

to a subsidiary corporation reduces the amount of the subsidiary corporation's mainstream tax which would be creditable but does not act as a subsidy.

Additionally, we are unable to conclude that the corporate offset is the type of benefit which was intended to be covered by the subsidy rules of section 901(i). The House of Representatives Committee on Ways and Means in H. Rept. 99-426, at 351 (1985), 1986-3 C.B. (Vol. 2) 1, 351, explained the reason for the enactment of section 901(i) as follows:

> As indicated above, a Treasury regulation denies a foreign tax credit for foreign taxes used directly or indirectly as a subsidy to the taxpayer. Absent this rule, the U.S. Treasury would, in effect, bear the cost of tax subsidy programs instituted by foreign countries for the direct or indirect benefit of their residents and certain nonresidents who do business with their residents. The committee is informed that some U.S. lenders and other U.S. taxpayers take tax return positions that are inconsistent with this rule. The committee does not believe that foreign tax credits should be allowed for foreign taxes which, while ostensibly imposed, are effectively rebated by the levying country by means of a government subsidy to the taxpayer, a related party, or a party to a transaction with the taxpayer. To eliminate any uncertainty in this area, the committee believes that the Treasury regulation disallowing foreign tax credits for taxes used as a subsidy to the taxpayer should be codified.

In the instant case, the U.S. Treasury does not bear the cost of ACT corporate offset. To the contrary, to the extent that the ACT corporate offset reduces the mainstream tax of a U.K. corporation, a U.S. taxpayer will be entitled to a lower foreign tax credit with respect to the mainstream tax. Accordingly,

allowing a foreign tax credit for the ACT paid by a first-tier subsidiary, even if that corporation allocates the corporate offset to one of its subsidiaries, results in no extra burden upon the U.S. Treasury.

On the basis of the foregoing analysis, we hold that, pursuant to Article 23(c)(1) of the U.S.-U.K. Convention, the payor of the ACT is the corporation that pays the dividend and the corresponding ACT, regardless of that corporation's use of the corporate offset or allocation of that offset to one of its subsidiaries.[9]  Accordingly, section 902(a) applies to the dividend received by petitioner in 1992.  Petitioner, therefore, is entitled to a foreign tax credit under section 901(a) for the payment of the ACT.  We have considered the parties' remaining arguments and find them irrelevant or unnecessary to reach.

To reflect the foregoing, and the prior opinions in the instant case,

<u>An appropriate order will be issued</u>.

---

[9]    We have been able to ascertain the intent of the signatories from the plain meaning of the language of Article 23 as well as from the structure of the U.S.-U.K. Convention itself. Consequently, we have not relied on extraneous statements made by the various parties to the treaty negotiations and attached to petitioners' motion.